UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
PETROSURANCE, INC.,

                    Plaintiff,

          - against -

NATIONAL ASSOCIATION OF INSURANCE
COMMISSIONERS and THE NATIONAL CONFERENCE
OF INSURANCE GUARANTY FUNDS, INC.,

                    Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

11 Civ. 6931 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Petrosurance, Inc. ("Petrosurance") brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., alleging that defendants National Association of Insurance Commissioners ("NAIC") and National Conference of Insurance Guaranty Funds, Inc. ("NCIGF") fraudulently delayed plaintiff's recovery of approximately $14 million from the liquidated estate of an Ohio insurance company. Defendants have jointly moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons discussed herein, defendants' motion is granted.

**BACKGROUND**[1]

I.   **OGICO's Liquidation**

Plaintiff was the sole shareholder of The Oil & Gas Insurance Company ("OGICO"), an Ohio-based casualty insurance company that was declared insolvent by the Franklin County Court of Common Pleas in Ohio (the "Trial Court") in August of 1990. Upon the declaration of insolvency, and over plaintiff's objection, that court ordered the Ohio Superintendent of Insurance (the "OSI") to liquidate the company.

The OSI initiated liquidation proceedings and distributed proof of claim forms that required all claims against the OGICO estate to be submitted by December 31, 1991. On October 3, 1996, the Trial Court ordered that, as of December 31, 1997, late-filed claims would no longer be accepted. During the intervening years, the OSI had made no payments to any of OGICO's creditors. The OSI allegedly first offered an explanation for this delay in 2001, indicating that no distributions could be made until the United States government had provided formal claim releases to

---

[1] These facts are derived from the complaint and the documents incorporated by reference or otherwise relied upon therein. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). To the extent the allegations in the complaint are well-pleaded, we take them as true for the purposes of this motion. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). We also take judicial notice of certain documents filed in other court proceedings, not for the truth of the information they contain, but only for the fact of their existence, see Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006), and to supply necessary context not provided by the complaint.

OGICO, even though the United States never asserted any claim on the OGICO estate.

Prior to the claim bar date, on August 21, 1991, a claim form was submitted by Mark G. Hardy[2] on behalf of himself and the family of companies to which plaintiff belongs, for an unstated amount of "intercompany balances and other monies due" (the "1991 Claim"). See Hudson v. Petrosurance, Inc. ("Petrosurance I"), No. 08AP-1030, 2009-Ohio-4307, ¶¶ 3, 41 (Ohio Ct. App. Aug. 25, 2009). The OSI denied that claim in its entirety on August 19, 2002, determining that it was a "Class 5" claim without value,[3] and no objections were filed with respect to that determination. See id. ¶¶ 3, 42.

No distributions from the liquidation estate were made until 2004,[4] when the Trial Court authorized a single payment to

---

[2] Although the complaint mentions Hardy only once -- without explaining who he is (Compl. ¶ 60) -- it is worth noting that he has been identified as a director of OGICO and of Petrosurance, and as exercising control over both entities. See Fabe v. Prompt Fin., Inc., 631 N.E.2d 614, 616 (Ohio 1994). Hardy, in fact, brought a suit in 2010 asserting claims similar to those at issue here against the same defendants named in this action. See Hardy v. Nat'l Ass'n of Ins. Comm'rs, No. 10 Civ. 4178, 2011 U.S. Dist. LEXIS 75078 (S.D.N.Y. May 23, 2011). That suit was dismissed for lack of standing. See id. at *12-13.

[3] Ohio's insurance liquidation scheme determines priority of payment based on classes. Claims of general creditors are deemed to be "Class 5," i.e., fifth in the line of priority. See Ohio Rev. Code Ann. § 3903.42(E). Classes with higher priority include administrative expenses, policyholders, and the federal government, see id. § 3903.42(A), (B), (C), while lower priority classes include state and local governments, late claims, and shareholders, see id. § 3903.42(F), (G), (J).

[4] The OGICO estate's federal tax returns for 2003 disclosed, for the first time, an approximately $11 million surplus, which the OSI allegedly described as "shareholder equity." (Compl. ¶ 21.)

each of OGICO's policyholder claimants in full and final settlement of their claims. A second payment was made in 2006 to all of OGICO's general creditors whose claims had been allowed, as well as state and local governments. At that time, the OGICO estate contained some $14 million, and plaintiff asserted that it had rights to the money as shareholder equity. The OSI provided plaintiff with a proof of claim form to formally assert its claim to the funds.

Months later, on April 30, 2007, before plaintiff had submitted this claim form, the OSI filed an action in the Trial Court seeking a declaratory judgment that plaintiff did not have a right to the funds remaining in the OGICO estate. Plaintiff opposed the action, contending that the relevant Ohio state legislation provided that, after all claims and administrative expenses have been paid, the balance of a liquidated insurance company's estate belongs to the company's shareholders. Acting on their respective positions, plaintiff attempted to file a proof of claim form on October 16, 2007 (the "2007 Claim"), and the OSI refused it on November 1, 2007. The complaint does not indicate the grounds on which the filing was refused, but apparently the OSI rejected the claim form because it was filed after the December 31, 1997 cut-off date for proof of claims and because the OSI considered it encompassed by the 1991 Claim,

which had been denied in 2002 without objection. See Petrosurance I, 2009-Ohio-4307, ¶ 7.

The OSI subsequently moved for summary judgment on its declaratory judgment action and requested an order permitting the pro rata distribution of the remainder of the estate as interest on the previously allowed claims. The Trial Court authorized the requested distribution in August of 2008, without ruling on whether plaintiff had properly asserted a claim to funds of the OGICO estate. Plaintiff appealed that decision, and it was reversed the following year by the Court of Appeals of Ohio (the "Appellate Court"), which found that the statutory scheme of priority in liquidations did not provide for the payment of interest.[5] See Petrosurance I, 2009-Ohio-4307, ¶ 35. The Appellate Court further found that the OSI should have accepted the 2007 Claim for filing because it was not encompassed by the 1991 Claim and the 2007 Claim was not subject to the December 31, 1997 bar date. See id. ¶¶ 30, 43, 44. That court did not, however, determine whether plaintiff was actually entitled to any money from the estate. See id. ¶ 46. The Appellate Court's decision, too, was appealed, and the Supreme Court of Ohio affirmed it and remanded the case to the Trial

---

[5] Ohio's current priority provision includes a class for claims of interest on allowed claims that is given higher priority than the shareholder class, see Ohio Rev. Code Ann. § 3903.42(I), but the interest class was added in a 2011 amendment and did not exist at the time of OGICO's liquidation.

Court to permit plaintiff to submit a proof of claim. See Hudson
v. Petrosurance, Inc., 936 N.E.2d 481, 487-88 (Ohio 2010).

Subsequently, plaintiff and the OSI settled the dispute,
under which settlement plaintiff was to receive approximately
$14 million from the OGICO estate. See Order, Taylor v. Oil &
Gas Ins. Co., no. 90CVH-05-3409 (Ohio C.P. Feb. 15, 2011). In
return, plaintiff released the following entities from liability
for claims related to the OGICO liquidation: the OGICO estate,
the OSI in her capacity as liquidator of OGICO and as Ohio's
representative in NAIC, and the OSI's "regulators" and
"consultants," among others. Release 1-3, annexed to Final
Closing Order, Taylor, no. 90CVH-05-3409 (Ohio C.P. Feb. 25,
2011).

## II.  **Defendants**

Plaintiff's substantive allegations with respect to
defendants are scant. NAIC is a Delaware corporation located in
Washington, DC that has a membership consisting of the principal
insurance regulatory officials of the United States, including
state insurance regulators like the OSI. NAIC allegedly
"formulates, represents and directs the views and conduct of the
state government officials who regulate the insurance industry
and enforce the states' insurance laws."[6] (Compl. ¶ 9.)

---

[6] NAIC describes itself as a "standard-setting and regulatory support
organization" through which "state insurance regulators establish standards
and best practices, conduct peer review, and coordinate their regulatory

The complaint describes NCIGF as a non-profit trade association located in Indiana that allegedly "monitors national insurance activities, coordinates information for multi-state insolvencies and provides legal and public policy support for its members," which are property and casualty guaranty funds.[7] (Compl. ¶ 11.) When NAIC members liquidate insurance companies, NCIGF members receive "early access payments" from the estates, which are used to ensure that the funds can themselves make distributions to claimants.[8] No other connection is alleged to exist between NAIC and NCIGF.

Defendants are alleged -- in highly conclusory fashion -- to control state insurance regulatory officials, including the OSI. (Compl. ¶¶ 3, 10, 31, 32.) They are, moreover, alleged to have formulated and advanced positions relied upon by the OSI when delaying payment to plaintiff in satisfaction of plaintiff's claim on the OGICO estate -- namely, (1) that

---

oversight." NAIC, About the NAIC, http://www.naic.org/index_about.htm (last visited Aug. 15, 2012). NAIC "supports these efforts and represents the collective views of state regulators." Id.

[7] NCIGF notes that, in the event an insurance company fails, policyholder claims are serviced by these funds, and claims are paid from a pool of assets consisting of the insurance company's remaining assets, cash already held by the state regulator, and assessments on insurers operating in that state. See NCIGF, Supporting a System of Policyholder Protection, http://www.ncigf.org/ (last visited Aug. 15, 2012). NCIGF "provides national assistance and support" to the funds. Id.

[8] The OSI allegedly applied to the Trial Court to authorize an early access payment to NCIGF members on December 13, 2000 and final payments to NCIGF members in November 2003. The complaint does not indicate whether either of these applications was granted.

shareholders of liquidated insurance companies have no claim to funds in the estate until all claims of higher priority -- including interest on those claims -- have been paid, and (2) that a liquidated insurance company should make no payments on any claims until the United States government has released its claims on the estate.

NAIC allegedly adopted a stance contrary to these positions in an amicus curiae brief it filed in Bowler v. United States, No. 02-1124 (Sup. Ct. Mar. 3, 2003), cert. denied 538 U.S. 1031 (2003) (the "Amicus Brief").[9] At issue in Bowler was the First Circuit's decision in Ruthardt v. United States, 303 F.3d 375, 384 (1st Cir. 2002), which held that claim bar dates for insurer liquidations do not apply to claims made by the United States. The decision permits the United States to file a claim in a liquidation at any time and be entitled to its normal priority, which, NAIC argued in the Amicus Brief, creates difficulty for state insurance liquidators in making distributions from an estate while such a specter still looms. See Amicus Brief at 5-6. NAIC has contended that this situation is bad policy, resulting in increased administrative expenses and claimants not being paid distributions that would otherwise be made until the

_____

[9] Although plaintiff is cryptically circumspect in its discussion of the Amicus Brief and has refused to identify the case in which it was filed -- despite defendants' challenges as to the adequacy of the pleading in the complaint -- plaintiff has provided enough information for us to identify the case and take judicial notice of the filing.

United States releases any potential claims it may have. <u>See</u> <u>id.</u> at 8-9.

## III. **<u>The Instant Suit</u>**

Plaintiff filed this suit on October 3, 2011. As best as we can determine its theory from its meandering and frequently conclusory complaint,[10] plaintiff appears to be contending that: defendants formulate policy positions on insurance company liquidation issues and specifically direct regulatory officials as to how to manage their liquidations; defendants established positions that shareholders of liquidated insurance companies should be paid only after interest on other allowed claims has been paid and that no claims should be paid until the United States releases its own claims; defendants knew that these positions were poor policy, as evidenced by the Amicus Brief filed by NAIC; defendants caused the OSI to adopt these positions; based on those positions, the OSI delayed making distributions from the estate; in perpetuating that delay, defendants caused communications to be sent by wire and mail that were either fraudulent or in furtherance of a fraud; also

---

[10] Plaintiff has suggested that the deficiencies in its complaint are due in part to its lack of discovery, which it asks it be permitted to take "before any ruling on a motion to dismiss." (Pl.'s Mem. in Opp'n to Mot. to Dismiss 2.) As plaintiff well knows, this request has no legal basis. <u>See</u> <u>Am. Commc'ns Ass'n v. Ret. Plan for Emps. of RCA Corp. & Subsidiary Cos.</u>, 488 F. Supp. 479, 484 (S.D.N.Y. 1980) ("It is not sufficient to say that appropriate allegations to plead a sufficient cause of action will be made after pre-trial discovery. . . . The discovery rules are designed to support a properly pleaded cause of action . . . [,] not to discover whether a claim exists."), <u>quoted in</u> <u>Hardy</u>, 2011 U.S. Dist. LEXIS 75078, at *13 n.4.

based on the positions advocated by defendants, the OSI brought the declaratory judgment action against Petrosurance; based on the arguments advanced in that action by the OSI, the Ohio Court granted the OSI's motion for summary judgment; and Petrosurance was therefore forced to incur legal costs and denied access to the funds it eventually received for an undue period of time. Together, these events allegedly amount to a RICO violation.

Plaintiff, in embellishing the mail and wire fraud aspect of its theory, has listed in its complaint a variety of communications allegedly made by mail or wire. In addition to the Amicus Brief, the complaint identifies: two memoranda dated March 17, 2002 and March 21, 2002, respectively, from Douglas L. Hertlein to Keith Berman, the contents of which are not described; a March 22, 2002 memorandum from Hertlein to Berman "refusing to disclose information as to claims filed against the OGICO estate"; a March 25, 2002 memorandum from Hertlein to Berman "refusing to disclose information about the OGICO estate"; an August 19, 2002 letter from Hertlein to an undisclosed recipient "stating that Petrosurance's claim [on the OGICO estate] was treated as a 'Class 5' claim 'valued in the amount of $0.00'"; an October 15, 2003 memorandum from Hertlein to Berman "asserting that Hertlein was waiting for a release from the 'US Government' before 'making a final distribution by the end of 2004'"; and a September 26, 2005 memorandum from

Hertlein to Hardy "stating, in part, that 'we are still awaiting a release from the Department of Justice for all claims of the Government against' OGICO." (Compl. ¶ 60 (alterations omitted).)

As mentioned, the complaint identifies Hardy only by his name, and the same is also true of Berman. It does note that Hertlein sent the September 26, 2005 memorandum from an e-mail address at OHLIQ.com, but it does not describe him in any other way. Other than the allegation that "upon information and belief defendants caused the [above] communications, among others, to be sent" (id.), no connection is alleged between any of the identified individuals and NAIC, NCIGF, or the OSI.

**DISCUSSION**

I.  **Abstention Under the Burford Doctrine Is Not Appropriate**

We begin our discussion by addressing whether we should exercise jurisdiction over this case. Defendants contend that, under the doctrine articulated by Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943), and its progeny, we should abstain from exercising the jurisdiction we would otherwise have over a case arising under federal law, see 28 U.S.C. § 1331. The Burford doctrine requires a district court to decline to interfere with state regulatory and administrative proceedings in two circumstances: "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result of the case then at bar,"

and "(2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361 (1989) (internal quotation marks omitted); see also Liberty Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 649-50 (2d Cir. 2009).

Under the Supreme Court's distillation of the Burford doctrine, it is apparent that we need not abstain from exercising jurisdiction in this case. Plaintiff is pursuing only federal RICO claims that do not hinge in any way on difficult questions under Ohio state law -- indeed, to the extent state law is relevant at all to the claims, the parties largely seem to agree on its application.[11] Nor will our decision in this case disrupt any state efforts to establish policy with respect to Ohio's liquidation of insurance companies because we need not "give one or another debatable construction to a state statute" and the issue before us is not "traditionally one of state concern." Liberty Mut., 585 F.3d at 650 (quoting Hachamovitch v. DeBuono, 159 F.3d 687, 697 (2d Cir. 1998)).

---

[11] The one aspect of Ohio law the parties do dispute is whether the OSI was under an obligation to pay OGICO's creditors as funds became available to do so. The question appears to be addressed by Ohio's insurance liquidation statute, see Ohio Rev. Code Ann. §§ 3903.34, 3903.44, but -- more importantly -- does not factor into our decision.

Abstention under _Burford_ is intended to avoid the possibility of "creating an opportunity to overturn a prior state court or agency determination," _Dittmer v. Cnty. of Suffolk_, 146 F.3d 113, 117 (2d Cir. 1998), but plaintiff does not challenge the OSI's determinations, only defendants' alleged interference in that process. _See_ Release 1-3 (prohibiting plaintiff from asserting any claims related to OGICO's liquidation against the estate or the OSI); _cf. Cruz v. TD Bank, N.A._, No. 10 Civ. 8026, 2012 U.S. Dist. LEXIS 29623, at *16-18 (S.D.N.Y. Mar. 2, 2012) (rejecting application of the _Burford_ doctrine because the plaintiffs were not collaterally attacking a state determination and the defendant did not articulate how the court's decision "would be disruptive of prior determinations by state administrators or regulatory bodies"); _cf. also Serio v. Black, Davis & Shue Agency, Inc._, No. 05 Civ. 15, 2005 U.S. Dist. LEXIS 23392 (S.D.N.Y. Oct. 11, 2005) (abstaining under _Burford_ with respect to claims asserted against an insurance company in rehabilitation). Mindful that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," and "an extraordinary and narrow exception" at that, _Colo. River Water Conservation Dist. v. United States_, 424 U.S. 800, 813 (1976), we do not abstain from exercising our jurisdiction in this case.

## II.  The McCarran-Ferguson Act Does Not Reverse Preempt RICO in This Case

We next address whether plaintiff's claims are properly brought pursuant to RICO. Defendants argue that plaintiff cannot assert RICO claims in this case because they are reverse preempted by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015. That act declares that it is "in the public interest" for the states to regulate and tax "the business of insurance," id. § 1011, and, accordingly, unless federal legislation "specifically relates to the business of insurance," it shall not be "construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating" that industry, id. § 1012(b).

The McCarran-Ferguson Act requires that a state law regulating "the business of insurance"[12] precludes a federal statute from redressing conduct "if the federal measure does not specifically relate to the business of insurance, and would invalidate, impair, or supersede the State's law." Humana Inc. v. Forsyth, 525 U.S. 299, 307 (1999) (internal quotation marks and alteration omitted); see also SEC v. Waltzer & Assocs., No. 96-6261, 1997 U.S. App. LEXIS 23830, at *5 (2d Cir. Sept. 10, 1997) (similar); Dornberger v. Metro. Life Ins. Co., 961 F.

---

[12]  The Supreme Court has been clear that state statutes regulating the insolvency of insurance companies -- and, indeed, Ohio's statutory scheme in particular -- should be considered as having been enacted for the purpose of regulating the business of insurance. See U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 504 (1993).

Supp. 506, 516 (S.D.N.Y. 1997) (similar). The question is thus whether RICO would, in this case, "directly conflict with state regulation" or whether application of RICO would "frustrate any declared state policy or interfere with a State's administrative regime." Humana, 525 U.S. at 310.

Defendants have attempted to analogize the instant case to Riverview Health Institute LLC v. Medical Mutual of Ohio, 601 F.3d 505 (6th Cir. 2010). In that case, the Sixth Circuit found RICO claims asserted against a health insurance company for allegedly delaying payment of insurance claims to be reverse preempted by the McCarran-Ferguson Act. In doing so, it held that a provision of Ohio's "comprehensive regulatory scheme to regulate the business of insurance" explicitly applied to "the timely processing and payment of insureds' healthcare claims." Id. at 515-16. In effect, because the plaintiffs were asserting claims against an insurance company for conduct specifically regulated by Ohio law, permitting the federal RICO claims to proceed would interfere with the established regulatory regime. See id. at 519.

The same is not true here. Plaintiff is bringing claims against two entities that are not insurance companies, are not Ohio businesses, and are not regulated by the Ohio insurance insolvency scheme. Moreover, the allegedly fraudulent conduct -- the formulation of policy positions -- is not implicated by the

15

insurance insolvency regime. We therefore do not believe that the RICO claims advanced here would frustrate Ohio's policies or regulatory aims, cf. Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 268 (3d Cir. 2007) (courts "should not go out of [their] way to find impairment of a state scheme when such impairment is not clear"), and, accordingly, we do not find plaintiff's claims to be reverse preempted. They are thus properly analyzed under RICO.

## III. Plaintiff Has Not Alleged the Elements of a RICO Claim

Having found that we have subject matter jurisdiction in this case and that the application of RICO is not precluded by Ohio's insurance regime, we turn to whether plaintiff has adequately alleged the elements of a civil RICO claim.

In broad strokes, plaintiff alleges that defendants -- groups that facilitate coordination amongst their members but do not appear to pass resolutions that are binding on them -- exerted not just influence but actual control over a state official and a trial court. It further alleges that defendants used that control to commit criminal acts in an attempt to prevent plaintiff from receiving any distributions from the OGICO estate. What motivation defendants had to pursue this end is never specified.

Plaintiff goes to extraordinary lengths to construct this fantastical scheme, a scheme that is ripe for dismissal simply

"because it defies logic." Nelson v. Publishers Circulation Fulfillment, Inc., No. 11 Civ. 1182, 2012 U.S. Dist. LEXIS 55238, at *9 (S.D.N.Y. Mar. 7, 2012). The complaint is clearly a strained effort to concoct a theory to somehow recover for the actions of the OSI, whom plaintiff has already released all of its claims against, and the Trial Court, an entity immune from suit based on its decisions even if later reversed. On its face, it is apparent that plaintiff's theory of liability would not survive even the most cursory plausibility analysis.

As might be expected, the complaint fares as poorly under the heightened pleading standard required of claims sounding in fraud as it does under common sense, and it consequently fails to establish most of the elements required of a civil RICO claim. Rather than belabor the inadequacy of the complaint, however, we will simply focus on its inability to satisfactorily allege the racketeering and causation elements of RICO.

**A.   Legal Standards**

     1.   Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). We need not, however, accept

as true mere "conclusions of law or unwarranted deductions of fact." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (internal quotation marks omitted).

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Twombly, 550 U.S. at 570.

Allegations of fraud are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b). See Moore v. PaineWebber, Inc., 189 F.3d 165, 172 (2d Cir. 1999). Such allegations must be "stated with particularity," which, in a RICO context, requires a plaintiff to "specify the statements it claims were false or misleading, give particulars as to the respect in which [it] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Id. at 172-73 (internal quotation marks omitted).

2.   RICO Claims

To sustain a private cause of action under RICO, a plaintiff must allege "(1) the defendant's violation of 18 U.S.C § 1962, (2) an injury to the plaintiff's business or property,

and (3) causation of the injury by the defendant's violation." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962). An underlying violation of RICO occurs when, relevantly, "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, . . . conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. 1962(c). Thus, in addition to injury and causation, a plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." Zavalidroga v. Cote, 395 F. App'x 737, 740-41 (2d Cir. 2010) (quoting Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)).

The "racketeering activity" requirement may be established by allegations of a wide variety of conduct. Plaintiff, in this case, has attempted to allege the requisite predicate acts by

asserting that defendants were engaged in mail and wire fraud, which are included in the statutory definition of "racketeering activity." 18 U.S.C. § 1961(1)(B). To establish RICO claims based on mail and wire fraud, a complaint must, as a threshold matter, allege "the existence of a fraudulent scheme." McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992). The complaint must also allege that "the defendant 'caused' the mailing or use of the wires" and that "the mailing or use of the wires 'was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.'" Maersk, Inc. v. Neewra, Inc., 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) (quoting United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989)). In short, a RICO complaint must provide "a detailed description of the underlying [fraudulent] scheme and the connection of the mail and/or wire communications to the scheme." In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

The last step in establishing a RICO claim is to allege that the plaintiff's injury was caused by the defendant's racketeering activities. See Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 323 (2d Cir. 2011). Where a RICO violation is predicated on acts sounding in fraud, a plaintiff must allege that the defendant's acts were not only the "but for" cause of plaintiff's injury, but the proximate cause as well,

necessitating "some direct relation between the injury asserted and the injurious conduct alleged"; "[a] link that is too remote, purely contingent, or indirect is insufficient." Hemi Grp., LLC v. City of New York, 130 S. Ct. 983, 989 (2010) (internal quotation marks and alteration omitted). This causation requirement is necessary because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Ideal Steel, 652 F.3d at 316 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458 (2006) (alteration omitted)).[13]

**B.   Racketeering Activity**

>   1.   Plaintiff Has Not Adequately Alleged the
>        Existence of Wire or Mail Fraud

At a minimum, plaintiff must describe some fraud with particularity, which it simply has not done. The complaint nowhere specifies what statements defendants are supposed to have made that were fraudulent. It does refer to three classes of statements -- the policy positions developed by defendants, the Amicus Brief, and the mail and wire communications sent by Hertlein -- but they either are not alleged to be fraudulent or

---

[13] Plaintiff's five-page discussion of the Supreme Court's holding in Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008), though thorough, has no bearing on our resolution of this issue. While true that a plaintiff need not demonstrate that it relied on a defendant's fraud in order to state a civil RICO claim, see id. at 661, it must still show a direct causative link, not disrupted by interceding elements, between the defendant's conduct and the plaintiff's injury, without which the injury would not have occurred. See Hemi Grp., 130 S. Ct. at 989.

are not pleaded with the specificity required to establish fraud.

First, plaintiff broadly alleges that defendants maintained "positions," "directives," and "views," but, even when describing the general tenor of those positions, it does not specify any particular statement ever made by either defendant. (E.g., Compl. ¶¶ 4, 9, 18, 19, 30, 33, 34, 37, 38, 43, 49.) Moreover, the complaint does not indicate where or when defendants articulated their alleged directives and views. These allegations do not rise to the requisite level of particularity. See Moore, 189 F.3d at 173 ("In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading [and] state when and where the statements were made . . . ." (internal quotation marks omitted)).

The only statements made by defendants that the complaint alleges with any specificity are those in the Amicus Brief.[14] That brief, however, is not alleged to contain fraudulent statements. Rather, plaintiff asserts that the statements therein actually "contradicted" the allegedly fraudulent

---

[14] We note that the Amicus Brief was filed only by NAIC, not by both defendants, and it therefore cannot establish liability on the part of NCIGF. Perhaps needless to say, plaintiff has alleged no agency or other relationship between NAIC and NCIGF. The closest it has come to doing so is to allege that members of NCIGF receive early access payments from estates that are liquidated by members of NAIC. This allegation, however, pertains to defendants' members, not defendants themselves. Moreover, we are aware of no authority that holds that a payment arrangement is, by itself, sufficient to establish an agency or control relationship.

positions defendants maintained with respect to the OGICO liquidation. (Compl. ¶ 43; see also id. ¶¶ 34, 36, 37, 38, 40.) In fact, if plaintiff's interpretation of the Amicus Brief is to be credited,[15] the brief would have hindered defendants' alleged scheme by exposing the fraudulent nature of those positions.

Finally, to the extent plaintiff is relying on the memoranda and letter sent by Hertlein (Compl. ¶ 60), the complaint does not adequately describe the statements contained therein. As noted earlier, the content of two of those communications -- the March 17, 2002 and March 21, 2002 memoranda from Hertlein to Berman -- is not described in any fashion, let alone with particularity. The content of two other memoranda from Hertlein to Berman, sent March 22, 2002 and March

---

[15] We do not agree with plaintiff's interpretation. The Amicus Brief specifically espouses NAIC's belief that the decision in Ruthardt functionally obligates insurance superintendants not to make any distributions from liquidated estates until the United States has either submitted or released its claims. See Amicus Brief 5-6. The select quotations from the brief that plaintiff has included in its complaint do not suggest otherwise; they are, rather, policy arguments NAIC advanced to argue that Ruthardt should be overturned. See id. at 8-9. Such arguments do not indicate that NAIC believed the OSI did not need to wait for releases from the United States before making distributions from the OGICO estate. Moreover, the brief nowhere addresses the issue of whether the claim of a shareholder of a liquidated insurance company is of a higher priority than a claim for interest on an otherwise allowed claim. If anything, the Amicus Brief suggests that NAIC truly believes that policyholders' claims to interest on their primary claims are valuable and should be allowed. See id. at 11 (noting that policyholders incur expenses while their claims are pending "in the form of interest free loans to the estate in the amount of what would be their timely paid claims"). Thus, even had plaintiff identified some allegedly fraudulent statements made by defendants, we would have an independent basis to dismiss the complaint because plaintiff has failed to "give particulars as to the respect in which [it] contend[s] the statements were fraudulent." Moore, 189 F.3d at 173 (internal quotation marks omitted); cf. Nelson, 2012 U.S. Dist. LEXIS 55238, at *9 ("A court may dismiss a mail or wire fraud claim where the alleged scheme to defraud does not demonstrate fraudulent intent because it defies logic . . . .").

25, 2002, is described in only the most general terms. The complaint alleges no more than that they "refus[ed] to disclose information" pertaining to claims against the OGICO estate and the estate itself, which does not begin to approach the level of specificity required. <u>See</u> <u>Moore</u>, 189 F.3d at 173. The three remaining communications are described in slightly greater detail but suffer from a defect alluded to earlier:[16] the complaint nowhere identifies Hertlein, the sender of the communications, other than to provide the e-mail address from which he sent only a single one of the communications. They are, therefore, also inadequately alleged.[17] <u>See</u> <u>id.</u> (a RICO complaint must, with particularity, "identify those responsible for the [allegedly fraudulent] statements").

---

[16] Moreover, we are skeptical that the August 19, 2002 letter is even relevant to the scheme alleged. It is described as "stating that Petrosurance's claim was treated as a 'Class 5' claim 'valued in the amount of $0.00.'" (Compl. ¶ 60.) At that time, however, the only relevant claim that had been made on the OGICO estate was the 1991 Claim made by Hardy, purporting to act for himself and "any and all other entities owned, controlled or affiliated by or with him." <u>Petrosurance I</u>, 2009-Ohio-4307, ¶ 3. That claim had been deemed Class 5 and given no value, <u>see</u> <u>id.</u> ¶ 42, and is therefore likely the subject of this communication. The 2002 denial of Hardy's claim, however, was not objected to, is not mentioned in the complaint, and is not part of the alleged scheme before us.

[17] Even drawing generous inferences to conclude that Hertlein is associated in some way with the OSI and crediting plaintiff's assertions that the OSI was controlled by defendants, only the September 26, 2005 memorandum would then be adequately pleaded. As discussed below, however, both of those steps are invalid.

2.    Plaintiff Has Not Adequately Alleged That
Defendants Caused Any Mailing or Use of Wires for
the Purpose of Executing a Fraud

Even assuming that plaintiff had sufficiently articulated defendants' fraudulent statements, it has failed to allege that defendants caused any of the alleged mail or wire communications for the purpose of executing a fraud.[18] Each was sent by Hertlein, who at most is alleged to have some affiliation with the OSI,[19] not with either defendant. Plaintiff must be relying on its broad-based allegations that defendants controlled the OSI to establish that defendants caused Hertlein to send the communications, but we do not accept the complaint's legal conclusions as true, nor are they sufficient to make plaintiff's theory plausible. See, e.g., First Nationwide Bank, 27 F.3d at 771; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., No. 02 Civ. 8726, 2004 U.S. Dist. LEXIS 7411, at *10 (S.D.N.Y. Apr. 28, 2004).

The closest plaintiff comes to substantiating the control allegations are its contentions that, "[g]iven the fact that

---

[18] The Amicus Brief clearly cannot satisfy this requirement because, as discussed, under plaintiff's theory, it exposed defendants' fraud. It therefore was not a communication sent "for the purpose of executing the scheme." Maersk, 687 F. Supp. 2d at 332 (internal quotation marks omitted).

[19] Even this link in plaintiff's allegations is extremely tenuous. Hertlein is alleged to have done no more than send an e-mail from an address at OHLIQ.com, the website of the Office of the Ohio Insurance Liquidator, which is hosted on a non-governmental domain. The OSI, by contrast, is affiliated with the Ohio Department of Insurance, see Ohio Rev. Code Ann. § 3901.011 ("The superintendent of insurance shall be the chief executive officer and director of the department of insurance . . . ."), the website of which is located at insurance.ohio.gov. The complaint contains no allegations indicating any relationship between the two organizations.

defendant NAIC's members consist of the principal regulatory officials of the states, defendant NAIC effectively controls the policies, interpretations, and views of the state insurance regulators, including the [OSI]," and that, "[l]ikewise, defendant NCIGF, which provides legal and public policy support for its members, effectively controls and directs the positions taken by insurance regulators such as the [OSI]." (Compl. ¶¶ 31, 32.) Were membership in an organization enough to establish control,[20] the American Bar Association, for instance, could be held liable for any number of lawyers' activities. It is plain that membership, unsupported by any other facts, is wholly insufficient to make allegations of control plausible. Cf. Teachers' Ret. Sys. of La. v. A.C.L.N. Ltd., No. 01 Civ. 11814, 2003 U.S. Dist. LEXIS 7869, at *38-39 (S.D.N.Y. May 12, 2003) (inferring control over member firms when the plaintiffs alleged that there were "stringent conditions with which each member firm has to comply to be part of the . . . network" and that "the organization's structure ensures strict quality control" (internal quotation marks omitted)). Similarly, legal support does not suggest control: lawyers are not assumed to control their clients.

These allegations, in short, are entirely inadequate to establish defendants' control of the OSI, and therefore

---

[20] We note that the OSI is not a member of NCIGF, nor is it alleged to be.

plaintiff has not alleged that defendants caused any mail or wire communications to be sent in connection with the fraudulent scheme. Moreover, the complaint does not identify who the recipients of any of the communications are, describing them not at all or by name alone; without that detail, it is impossible for the complaint to establish that the communications were sent "for the purpose of executing the scheme." Maersk, 687 F. Supp. 2d at 332 (internal quotation marks omitted).

### C.   Causation of Injury

Plaintiff must allege defendants' racketeering activities were both the proximate cause and the cause-in-fact of its alleged injury. Plaintiff's theory, however, falters under both types of causation.

First, plaintiff has not alleged that any of defendants' actions actually caused it injury; to the extent plaintiff was harmed, it was the delay in its receipt of distributions caused by the OSI and sanctioned by the Trial Court, not defendants' policy positions, that was the proximate cause. The OSI and the Trial Court were intervening factors that severed the link between defendants and any injury to plaintiff, as essentially acknowledged by the complaint (Compl. ¶¶ 18 (alleging that it was the OSI who did not pay creditors of the OGICO estate), 27 (alleging that it was the OSI who filed the declaratory judgment action against plaintiff), 45 (alleging that the Trial Court

27

granted the OSI's motion for summary judgment), 49 (alleging that the OSI appealed to the Supreme Court of Ohio)). As discussed, plaintiff has not adequately alleged that defendants controlled the OSI's actions, and it has -- quite reasonably -- made no attempt at all to make similar claims about the Trial Court. In short, plaintiff's theory of causation is remote, contingent, and indirect, and thus wholly inadequate. See Hemi Grp., 130 S. Ct. at 989.

Second, even if we were to accept plaintiff's attempt to conflate the OSI with defendants and ignore the Trial Court's role in the bankruptcy proceedings, the allegedly fraudulent positions defendants advocated were not the but-for cause of the alleged injury. Plaintiff had submitted no claim for its shareholder equity on the estate until 2007 and thus could not have recovered anything prior to that point. Moreover, the OSI rejected the claim form plaintiff submitted in 2007 because it was filed well after the established cut-off date for such claims and because the 1991 Claim encompassed the 2007 Claim. See Petrosurance I, 2009-Ohio-4307, ¶ 7. As a result, plaintiff would not have received its funds as early as it wanted even in the absence of the OSI's declaratory judgment action and the subsequent ruling by the Trial Court. Plaintiff's complaint therefore fails on these grounds as well.

D.    **Conspiracy**

Given the pleading failures described above, plaintiff's claims of substantive violations of RICO under Section 1962(c) fail. A failure to adequately allege a substantive violation of RICO necessitates that allegations of conspiracy to violate RICO also fail. See First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004) (affirming dismissal of claims of conspiracy to violate RICO in light of the dismissal of the substantive RICO claims); Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 312 (S.D.N.Y. 2009) ("[A] plaintiff's RICO conspiracy claim fails if the plaintiff's substantive RICO claims are deficient."); Maersk, 554 F. Supp. 2d at 462 ("There can be no RICO conspiracy without a substantive RICO violation."). Accordingly, plaintiff's claim of conspiracy to violate RICO under 28 U.S.C. § 1962(d) is also dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, the motion (docket no. 8) is granted. Because the Court has already given plaintiff the opportunity to amend its complaint in light of defendants' proposed motion to dismiss, which opportunity plaintiff declined, the dismissal is made with prejudice.

Dated:     New York, New York
           August 20, 2012


                              _____
                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE



Copies of the foregoing Order have been mailed on this date to
the following:

**Attorney for Plaintiff**
Paul Batista, Esq.
Paul Batista, P.C.
26 Broadway, Suite 1900
New York, NY 10004

**Attorney for Defendant NAIC**
Melissa Brill, Esq.
Cozen O'Connor
45 Broadway, 16th Floor
New York, NY 10006

**Attorney for Defendant NCIGF**
Barry I. Levy, Esq.
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556-0926